**ROYAL INSURANCE CO. (U.K.) a/s/o Highmead Technologies, Ltd., Plaintiff,**

v.

**FOUNTAIN TECHNOLOGIES, INC., a Corporation d/b/a GALAXCO, Kamino International Transport, Inc. and Cargo Max, Inc., Defendants.**

No. 96 Civ. 1659 (AGS)(AJP).

United States District Court, S.D. New York.

Nov. 4, 1997.

Jamie F. Campise, Marcigliano & Campise, New York City, for Plaintiff.

Patrick J. Corbett, Bigham Englar Jones & Houston, New York City, for Defendants.

## OPINION AND ORDER

SCHWARTZ, District Judge.

Before the Court is a Report and Recommendation (the "Report") of United States Magistrate Judge Andrew J. Peck dated September 29, 1997, recommending that the Court deny plaintiff's motion to strike defendant Kamino International Transport's ("Kamino") defense of limited liability and grant Kamino's cross-motion to limit its liability to $50 per package. Having received the Report, both parties' objections to the Report, and both parties' responses to the objections, and having conducted a *de novo* review of the record, the Court hereby rejects certain of the Magistrate Judge's findings of fact and conclusions of law,[1] and adopts the recommendations only in part.

■ There is no question that a shipper and a carrier are free to negotiate a contract which proportions the carrier's rate to the risk to which it is exposed. *See U.S. Gold Corp. v. Federal Exp. Corp.*, 719 F.Supp.

1217, 1224 (S.D.N.Y.1989). The Report correctly notes that federal common law permits a common carrier to limit its liability for harm to cargo in exchange for a low carriage rate. *See Deiro v. American Airlines. Inc.*, 816 F.2d 1360, 1365 (9th Cir.1987). A liability limitation provision, however, is enforceable only if "the shipper was given the option of additional recovery upon paying a greater rate...." *Williams Dental Co. v. Air Express Int'l*, 824 F.Supp. 435, 441 (S.D.N.Y.), *aff'd mem.*, 17 F.3d 392 (2d Cir.1993). The question, then, becomes whether Fountain Technologies, Inc. ("Fountain") was given a fair opportunity to declare a higher value in exchange for paying a higher rate.

■ The Report recognizes that even in the absence of a writing,[2] a court may find that a carrier is entitled to limited liability based upon its prior course of dealings with a shipper. *See, e.g., Calvin Klein Ltd. v. Trylon Trucking Corp.*, 892 F.2d 191, 193 (2d Cir.1989). More specifically, the Report finds that "Fountain was familiar with Kamino's standard invoice and air waybill." (R & R at 20.) The Report also notes that "Kamino's standard air waybill invites Kamino's customer, in return for a higher shipping rate, to declare a higher value for the goods being shipped than that assigned the goods in the absence of such a declaration." (*Id.*) While these are both accurate statements of fact, they do not support the Report's conclusion that Fountain had had an opportunity to declare a higher value under the particular circumstances of this case.

The computers in question disappeared while en route by truck from a Brooklyn warehouse to Newark Airport. An air waybill, had it been issued, would have been a contract for carriage only from Newark Airport to London.[3] It would not have covered transportation from Brooklyn to Newark.

---

1. The parties do not object to the Report's findings that Kamino is a common carrier and that the Warsaw Convention and Carmack Amendment are not applicable in this case. The Court adopts these findings.

2. Because the cargo vanished before arriving at Newark Airport, an air bill was never issued. It is for this reason that the Report relied upon the parties' course of dealing.

3. The air waybill covers only air carriers. (¶ 1.) The "first carrier" listed on previous waybills is Virgin Airlines, not the trucking company. Kamino arranges trucking through a company called Cargo Max (Galella Dep. at 51–53). There is no indication in the record that Cargo Max is in any way affiliated with Virgin.

Thus, the provisions of the air waybill permitting Fountain to declare a higher value are not, by their terms, applicable to the period of time in which the computers vanished. A genuine issue of material fact therefore remains as to whether anything else in the prior course of dealings between the parties put Fountain on notice that it could declare a higher value for purposes of the truck journey from Brooklyn to Newark. This issue of fact, of course, precludes a grant of summary judgment. Fed.R.Civ.P. 56(c).

In addition, we have no evidence before us as to whether the shipment in question, consisting of 290 computers, was in any way similar to previous shipments, either in quantity or in value. Assuming *arguendo* that Fountain, based upon the prior course of dealings, knew that it could declare a higher value for purposes of the trucking portion, and also assuming that, in the past, Fountain had not elected to declare a higher value, we would still need to know whether this was a typical shipment in order to predict how Fountain would have acted in regard to this shipment.

In sum, the Court adopts the recommendation that we deny plaintiff's motion to strike defendant Kamino's defense of limited liability, although not on the grounds set forth in the Report, and rejects the recommendation that we grant Kamino's cross-motion to limit its liability to $50 per package.

### CONCLUSION

For the reasons set forth above, Magistrate Judge Peck's Report is rejected. Summary judgment is denied on Royal Insurance Co.'s motion to strike the Eighth Affirmative Defense of Kamino International, Inc. Summary judgment is also denied on Kamino International, Inc.'s motion to limit its liability.

SO ORDERED.

### REPORT AND RECOMMENDATION

PECK, United States Magistrate Judge.

To the Honorable Allen G. Schwartz,
United States District Judge.

This case involves an international shipment of computers that was hijacked en route to its final destination. Presently before the Court is plaintiff's motion to dismiss defendant Kamino International Transport's defense of limited liability, and Kamino's cross-motion to limit its liability to $50 per package. Decision of the motions requires the Court's determination of several issues. The first issue is whether defendant Kamino is a common carrier (thereby responsible for loss while the cargo was in the trucker's possession) or merely a freight forwarder (thus liable only for its own negligence) A consideration of the relevant factors leads the Court to conclude that Kamino is a common carrier. The second and third issues are whether the Warsaw Convention and Carmack Amendment are applicable, and the Court determines that they are not. Finally, the Court finds that Kamino's liability limitation is enforceable because of the parties' lengthy prior course of dealings that included certain limitations.

### *FACTS*

#### *The Parties*

Highmead Technologies, Ltd. is a computer wholesaler located in England. (Plf.3(g) ¶ 1.) Plaintiff Royal Insurance Co. (U.K.) Ltd. issued an insurance policy to Highmead covering shipments of goods in transit. (Plf.3(g) ¶ 2.) By virtue of Royal's payment to Highmead for the loss at issue in the instant case, Royal is suing as subrogee of Highmead. (Plf.3(g) ¶¶ 3, 4.)

Fountain Technologies, Inc. manufactures personal computers. (Plf.3(g) ¶ 5.) Galaxco assembled Fountain's computer systems. (Plf.3(g) ¶ 6.)

Kamino is in the business of transporting goods by means of a combination of its own efforts and arranging for other companies to carry out its jobs. (Galella Aff. ¶¶ 3, 10; Galella Dep. at 104.) Kamino offered "door to door" service, including pick up, airport transfers and customs clearances. (Plf.3(g) ¶¶ 9, 13; Kamino 3(g) ¶ 5; Galella Aff. ¶¶ 3, 5; Galella Dep. at 26.) Kamino charged an all inclusive, set fee; it did not merely pass through its costs and charge a fee on top of those costs. (*See* Galella Aff. ¶ 3; Galella

Dep. at 27–28, 51–53.) Kamino decided what direct air or trucking carriers to use, and any savings from Kamino using a less expensive direct carrier were not passed on to Kamino's customer. (Galella Dep. at 51–53, 102–03.)

Kamino provided these services to Fountain since 1992, and to Highmead since February 1994. (Galella Aff. ¶ 2.) Kamino had shipped computers from Fountain to Highmead on numerous occasions, sometimes at Fountain's behest and sometimes at Highmead's; Kamino's prior dealings with Fountain and Highmead consisted of at least 20 shipments for each. (Galella Aff. ¶ 2; Al-Najjar Dep. at 140–41.)

### The Loss of Highmead's Computers While in Transit

In late February 1995, Highmead contracted to buy 290 computers from Fountain, to be shipped from Galaxco's location in Brooklyn, New York to Highmead in England. (Plf.3(g) ¶ 10; Galella Dep. at 103.) Fountain instructed Kamino, by fax, to transport the computers from Galaxco's facility in Brooklyn to Highmead in England. (Plf.3(g) ¶ 12.) Fountain did not give Kamino any other instructions as to the manner of shipment. (Plf.3(g) ¶ 14.) Kamino hired Cargo Max, Inc. to transport the shipment from Galaxco in Brooklyn to Newark Airport, where it would then be loaded on an airplane for carriage to England. (Plf.3(g) ¶ 13; Galella Dep. at 51–53.)

Ronald Artis, a Cargo Max employee, acknowledged receipt of the shipment at Galaxco's Brooklyn warehouse. (Plf.3(g) ¶ 15; Kamino Ex. A.) However, the shipment never arrived at Newark Airport; during the trip from Brooklyn to Newark, the shipment was hijacked, stolen or otherwise lost. (Plf.3(g) ¶ 16.) Because this shipment never arrived at the airport, no invoice, air waybill or any other document was ever issued with respect to this shipment, although Kamino had drafted an air waybill for this shipment and given it an air waybill number. (Plf.3(g) ¶¶ 10, 17, 22; Kamino 3(g) ¶¶ 4, 10, 12; Galella Dep. at 12–15; see Corbett 3/13/97 Aff. Ex. 7.)

### Kamino's Prior Course of Dealings With Highmead and Fountain

Typically, Kamino would issue two documents to the shipper after the goods were tendered for air carriage. (See Plf. 3(g) ¶ 22; Galella Aff. ¶ 6; Kamino 3(g) ¶¶ 4, 12; Galella Dep. at 36–37.) Kamino would issue an invoice containing a provision limiting Kamino's liability to $50 per package. (See Galella Aff. ¶ 6; Kamino Ex. D: Standard Kamino Invoice; see also Plf. 3(g) ¶ 20; Kamino 3(g) ¶ 12; Galella Dep. at 35–37.) The $50 per package limitation reads as follows:

> It is agreed that if the property covered by this bill is entrusted or delivered to any express company, truckman, steamship, railroad or other carrier whether named in this receipt or not (which Kamino Air Transport, Inc. is hereby authorized to do: subject to all the usual conditions of transportation of such carrier or others), such person or company so selected shall be regarded as the agent of the shipper, consignee or owner of said property, and as such alone liable, and Kamino Air Transport, Inc. shall not be, in any event, responsible for the negligence or non-performance of such company or person, nor for any error of judgement or misinterpretation of instructions and *in no event shall the shipper, consignee or owner of said property demand or recover beyond the sum of $50.00* (or the invoice value thereof if less) *at which each package is hereby valued.*

(Kamino Ex. D, emphasis added.)

Kamino also would issue an air waybill, the front of which provides that: "THE SHIPPER'S ATTENTION IS DRAWN TO THE NOTICE CONCERNING CARRIER'S LIMITATION OF LIABILITY. Shipper may increase such limitation of liability by declaring a higher value for carriage and paying a supplemental charge if required." (Kamino Supp. Br. Ex. 2: Kamino Standard Air Waybill; accord, Corbett 3/13/97 Aff. Ex. 7.) A box labeled "Declared Value for Carriage" is also included on the front of the air waybill. (Id.) The back of the air waybill contains the specific provision to which the notice on the front refers:

Except as otherwise provided in carrier's tariffs or conditions of carriage, in carriage to which the Warsaw Convention does not apply carriers' liability shall not exceed USD 20.00 or the equivalent per kilogram of goods lost, damaged or delayed, unless a higher value is declared by the shipper and a supplementary charge paid.

(*Id.*, reverse side, ¶ 4.)

These invoices and air waybills were familiar to Fountain and Highmead from their numerous prior dealings with Kamino. (Plf.3(g) ¶¶ 17, 20, 22; Kamino 3(g) ¶ 12; Galella Dep. at 32; Al–Najjar Dep. at 50–51, 141.)

### The Parties' Current Relationship in this Litigation

The "present caption does not reflect the true state of the parties' relationships. Fountain is now a plaintiff suing Kamino" along with Highmead. (Corbett 3/27/97 Aff. ¶ 8.) Fountain and Highmead are identically situated with respect to the pending motions as to the enforceability of Kamino's liability limitation. Therefore, for purposes of simplification, the Court will refer to Fountain and Highmead together as "Fountain" for the remainder of this Report and Recommendation. Plaintiff also settled with Galaxco. (Memo Endorsed Order dated 1/23/97.) Finally, Cargo Max has not responded to the complaint or to defendants' cross-claims, and the Court entered a default judgment as to Cargo Max. (3/12/97 Report & Rec., *aff'd*, 4/15/97 Order.)

### ANALYSIS

### I. SUMMARY JUDGMENT STANDARDS

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991); *Hernandez v. New York City Law Dept. Corp. Counsel,* 94 Civ. 9042, 1997 WL 27047 at \*6 (S.D.N.Y. Jan.23, 1997) (Peck, M.J.); *Burger v. Litton Indus., Inc.,* 91 Civ. 0918, 1996 WL 421449 at \*7 (S.D.N.Y. Apr.25, 1996) (Peck, M.J.). *report & rec. adopted by* 1996 WL 609421 (S.D.N.Y. Oct.22, 1996).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment, here, the plaintiff. *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 36 (2d Cir.1994); Gallo v. *Prudential Residential Services, Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994); *Hernandez v. New York City Law Dept.,* 1997 WL 27047 at \*6; *Burger v. Litton,* 1996 WL 421449 at \*7. The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. *E.g., Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552–53; *Ruiz v. Selsky,* 96 Civ.2003, 1997 WL 137448 at \*3 (S.D.N.Y. March 24, 1997) (Peck, M.J.).

To defeat a motion for summary judgment, the non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e); *accord, e.g., Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356.

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [his] favor." *Anderson v. Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513; *Chambers v. TRM,* 43 F.3d at 36; *Gallo v. Prudential,* 22 F.3d at 1223. The Court draws all inferences in favor of the nonmoving party only after determining that such inferences are reason-

able considering all the evidence presented. *See, e.g., Apex Oil Co. v. DiMauro*, 822, F.2d 246, 252 (2d Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987); *Hernandez v. New York City Law Dept.*, 1997 WL 27047 at *7; *Burger v. Litton*, 1996 WL 421449 at *7. "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM*, 43 F.3d at 37.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine the existence of any disputed issues of material fact. *See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir.1987); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *Ruiz v. Selsky*, 1997 WL 137448 at *3. To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. *Anderson v. Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510. While "disputes over facts that might affect the outcome of a suit under the governing law will properly preclude the entry of summary judgment[,][f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citations omitted); *see also, e.g., Knight* v. *United States Fire Ins. Co.*, 804 F.2d at 11–12; *Shaw v. City of New York*, 95 Civ. 9325, 1997 WL 187352 at *2 (S.D.N.Y. April 15, 1997) (Peck, M.J.); *Ruiz v. Selsky*, 1997 WL 137448 at *3.

## II. *KAMINO IS A COMMON CARRIER*

■ To determine Kamino's liability, the Court must first determine whether Kamino is an indirect common carrier[1] or merely a freight forwarder. A "freight forwarder is liable for lost or damaged goods only for its own negligence, including negligence in choosing a carrier; but a forwarder who contracts to deliver the goods to their destination, as well as or instead of arranging for their transportation, becomes liable as a common carrier for loss or damage to the goods, whether the fault or other basis of liability for damages lies with that forwarder or with the underlying carrier actually transporting the goods." *Zima Corp. v. M.V. Roman Pazinski*, 493 F.Supp. 268, 274 (S.D.N.Y. 1980).

In *Royal Ins. v. Amerford Air Cargo*, this Court explained that:

Factors to be considered "in determining whether a party acted only as a forwarder or as a forwarder-carrier include ... the way the party's obligation is expressed in documents pertaining to the agreement, ... [and] the history of dealings between the parties." Another significant factor is

how the party made its profit, in particular, whether the party "picked up the less-than-carload shipment at the shipper's place of business and engaged to deliver it safely at its ultimate destination [charging] a rate covering the entire transportation and [making] its profit by consolidating the shipment with others" ... [,] while the shipper "seldom if ever knew which carrier would be utilized in the carriage of his shipment" ...

*Royal Ins. v. Amerford Air Cargo*, 654 F.Supp. 679, 682 (S.D.N.Y.1987) (citation omitted; ellipsis and brackets in *Royal*)

---

1. A common carrier may be of the direct or indirect variety:

The difference between direct and indirect air carriers has been defined as follows:

Direct air carriers are those who operate aircraft, while indirect air carriers hold out a transportation service to the public under which they utilize the services of a direct carrier for the actual transportation by air....

*Royal Ins. v. Amerford Air Cargo*, 654 F.Supp. 679, 682 (S.D.N.Y.1987). Clearly, Kamino is not a direct carrier. However, an indirect carrier "assume[s] the responsibility of a [direct] carrier,

[although they] ship by air in direct carrier's planes." *Id.* Thus, if Kamino is an indirect carrier, Kamino assumed the obligations of a direct carrier.

The Court notes that Amerford's indirect carrier doctrine has been questioned within the Warsaw Convention context. *See American Home Assurance Co. v. Jacky Maeder (Hong Kong) Ltd.*, 969 F.Supp. 184, 191 n. 5 (S.D.N.Y.1997). Because the Court concludes that the Warsaw Convention is not applicable (*see* Section III below), the Court need not further address Judge Kaplan's *Jacky Maeder* decision concerns in this case.

(quoting and citing *Zima Corp. v. M.V. Roman Pazinski,* 493 F.Supp. at 273).

Applying these factors, the Court finds that Kamino is a common carrier. Throughout their lengthy history of dealings, Kamino has issued air waybills to Fountain which refer to Kamino as the "carrier." (*See generally* Kamino Supp. Br. Ex. 2: Kamino Standard Air Waybill; Plf. Ex. H; Corbett 3/13/97 Aff. Ex. 7.) *See also, e.g., Martin Marietta Corp. v. Harper Group,* 950 F.Supp. 1250, 1255 (S.D.N.Y.1997) (in discussing whether defendant is a carrier, relies on fact that defendant's "waybill indicates that the air freight company is a 'carrier,' . . ., as does the parties' Corporate Transportation Agreement, . . . the contract which governs the provision of [defendant's] international transportation services" to plaintiff).

In fact, in the air waybill typically issued by Kamino to Fountain and others, Kamino is identified as the carrier and described its obligations thusly: "Carrier undertakes to complete the carriage hereunder with reasonable dispatch." (Corbett 3/13/97 Aff. Ex. 7, front & reverse ¶ 8.1.) Thus, Kamino not only referred to itself as a "carrier," but also Kamino held itself out as offering to "undertake[ ] to complete the carriage." (*Id.*) As the *Zima* Court explained, the difference between a common carrier and a freight forwarder

> rests on the distinction between those freight forwarders "who in essence, act as export departments for their shipping clients" in securing cargo space on a vessel, advising on licensing and letter of credit terms, getting the shipment to the dock on time, clearing Customs, etc. and others . . . who hold themselves out "not merely to arrange with common carriers for the transportation of the goods, but rather to deliver them safely to the consignee," in which case the forwarder acts as shipper with respect to the carrier who actually transports the goods and as carrier with respect to the original shipper.

*Zima Corp. v. M.V. Roman Pazinski,* 493 F.Supp. at 273 (citations omitted). Kamino's air waybill demonstrates that it held itself out as offering to ship the goods, not merely arrange the shipping of the goods. In other words, Kamino acted as a forwarder-common carrier, *not* merely a freight forwarder.

In addition, Kamino contracted to ship the computers "from door to door." (Plf.3(g) ¶¶ 9, 13; Kamino 3(g) ¶ 5; Galella Aff. ¶¶ 3, 5; Galella Dep. at 26.) For this service, Kamino did not merely pass along the costs that it incurred in shipping the goods with an additional fee for its services; rather, it charged one fee for transportation of the goods from door to door, while Fountain "seldom if ever knew [in advance] which carrier would be utilized in the carriage of his shipment. . . . " (Galella Dep. at 27–28, 51–53, 102–03.) In fact, if Kamino found a less expensive direct carrier (such as trucker Cargo Max), Kamino did not pass the savings along to Fountain, but rather kept the difference. (Galella Dep. at 51–53, 102–03.)

The facts here are quite similar to those from which the *Amerford* Court found the defendant to be a carrier. In *Amerford,* the first fact the Court relied upon was that the defendant issued an air waybill which identified it as a carrier. *Royal Ins. v. Amerford Air Cargo,* 654 F.Supp. at 682.

> Second, [the parties] had conducted business over an extended period of time and [plaintiff] was familiar with [defendant's] business practices. . . . Third, [plaintiff] always contracted with [defendant] to handle the entire transaction, i.e., pick-up from its facility, temporary storage of the goods pending transport, and arrangement for their shipment via a direct air carrier. [Plaintiff] paid one fee for these services, and it included the price of air transport on the direct carrier.

*Id.*[2]

Like the *Amerford* Court, this Court finds Kamino to be a carrier.

---

2. The only distinction between the *Amerford* facts and those existing here is that here the air waybill had not been issued at the time of the loss. However, in light of the fact that Kamino had issued these air waybills to Fountain on numerous previous occasions, the result should not be any different than in *Amerford.*

## III. THE WARSAW CONVENTION GOVERNING TRANSPORTATION BY AIR IS INAPPLICABLE BECAUSE KAMINO HAS REBUTTED THE PRESUMPTION IN FAVOR OF APPLYING THE CONVENTION

Highmead's computers were to be shipped by air from the United States to Great Britain, both of which are High Contracting Parties to the Warsaw Convention. *See* Warsaw Convention, Preamble (listing High Contracting Parties). Therefore, the Warsaw Convention would apply, *see* Warsaw Convention, Article 1, if the loss occurred during "transportation by air":

Section 1 of Article 18 of the Warsaw Convention provides that liability under the Convention extends to any damage to baggage or goods sustained during "transportation by air." This phrase is defined in section 2 of Article 18 as "the period during which the baggage or goods are in charge of the carrier, whether in an airport or on board an aircraft." However, section 3 of the same article provides, in pertinent part:

The period of the transportation by air shall not extend to any transportation by land ... performed outside an airport. If, however, such transportation takes place in the performance of a contract for transportation by air, for the purpose of loading, delivery or transshipment, any damage is presumed, subject to proof to the contrary, to have been the result of an event which took place during the transportation by air.

*Victoria Sales Corp. v. Emery Air Freight, Inc.,* 917 F.2d 705, 706–07 (2d Cir.1990). Thus, the "plain language of Article 18 draws the line at the airport's border. The Convention's' coverage excludes any transportation by land outside the airport." *Id.* at 707.

Since the loss in the instant case took "place in the performance of a contract for transportation by air," the plain language of Article 18 requires that the loss be "presumed, subject to proof to the contrary, to have been the result of an event which took place during the transportation by air." 49

U.S.C. § 40105 [hereinafter "Warsaw Convention"], Article 18; *see also Victoria Sales v. Emery Air Freight,* 917 F.2d at 707–08 ("Although Article 18 creates a presumption that any damage or loss occurring during the performance of a contract for air transportation was the result of an event during transportation by air, that is, on board an aircraft or within an airport, the presumption may be rebutted by evidence demonstrating that the loss occurred on land outside the airport.... Because the shipment ... was admittedly lost at [defendant's] warehouse outside the airport, the presumption favoring Warsaw Convention coverage has been rebutted and the Convention does not govern."); *Royal Ins. Co. of America v. Air Express Int'l,* 906 F.Supp. 218, 219–20 (S.D.N.Y.1995) ("Thus, unless the defendant can rebut the presumption by showing where the goods actually were lost, the Court must conclude that the goods were lost during transportation by air.").

Kamino has rebutted the presumption here. Both parties agree that the computer shipment was lost outside the airport. (*See* Plf. Supp. Br. at 4 ("The parties herein do not dispute that the instant case involves the loss of goods outside the airport.... [T]he loss took place on the ground on Canal Street.")); Plf. Br. at 1 ("the truck was allegedly hi-jacked on Canal Street and the computers were stolen"); Kamino Supp. Br. at 7 ("In the case at bar, it is alleged the cargo was lost by a trucker *en route* to the airport. Although this has not been proven, no rebuttal evidence has been presented. As such, Kamino will not argue that the limitations of the Warsaw Convention apply."). Indeed, Fountain has offered a police report stating that the goods were hijacked in Manhattan. (*See* Plf. Supp. Br. Ex. D: Police Report ("Exact location where crime/loss took place [:] w/b Canal and Elizabeth St." in New York City)). Therefore, the Warsaw Convention's presumption has been rebutted and the Warsaw Convention is not applicable in this case.

## IV. THE CARMACK AMENDMENT ALSO IS INAPPLICABLE

The Carmack Amendment [3] would govern the instant dispute if the carriage of

---

**3.** Carmack Amendment to Hepburn Act, June 29, 1906, ch. 3591, § 7 (¶¶ 11, 12), 34 Stat. 595 (*see*

goods came within the jurisdiction of the Interstate Commerce Commission ("ICC"). *See Sega of America, Inc. v. A.M. Express Freight, Inc.*, 92 Civ. 5838 & 8382, 1995 WL 577784 at *4 (S.D.N.Y. Sept. 29, 1995) ("The Carmack Amendment ... would apply in the present case only if the carriage of [plaintiff's] goods by the defendants came within the jurisdiction of the I.C.C."), *aff'd mem.*, 108 F.3d 329 (2d Cir.1997).[4]

The ICC has jurisdiction over "transportation by motor carrier ... to the extent that ... property ... [is] transported by motor carrier (1) between a place in (A) a state and a place in another state." Carmack Amendment, 49 U.S.C. § 10521(a)(1)(a). However, a subsequent provision carves out an exception to the ICC's jurisdiction for "transportation provided entirely in a municipality, in contiguous municipalities, or in a zone that is adjacent to, and commercially a part of, the municipality. Carmack Amendment, 49 U.S.C. § 10526(b)." "Pertinent regulations define the 'New York City commercial zone,' within which transportation is exempt from I.C.C. jurisdiction pursuant to § 10526, as including the municipality of New York and 'all points within a line drawn 20 miles beyond the municipal limits of New York, NY.'" *Sega v. A.M. Express Freight*, 1995 WL 577784 at *5 (quoting 49 C.F.R. § 1048.20(a), (b)). Since Newark Airport is within 20 miles of New York City, the instant case would not have been within the ICC's jurisdiction, and

49 U.S.C. §§ 10103, 10730, 11707), *superseded by* ICC Termination Act of 1995, 109 Stat. 803.

4. "Effective on January 1, 1996, the ICC Termination Act of 1995, Pub.L. No. 104–88, § 101, 109 Stat. 803, 804, abolished the ICC, but transferred most of the Commission's functions to a new agency within the Department of Transportation called the Surface Transportation Board. See 49 U.S.C.A. § 702 (West 1996) (added by ICC Termination Act § 201, 109 Stat. at 932)." *In re Olympia Holding Corp. (Whitaker v. Frito–Lay, Inc.)*, 88 F.3d 952, 955 n. 2 (11th Cir.1996).

The savings provisions of The ICC Termination Act provide that "[t]his Act shall not affect *suits commenced* before the date of the enactment of this Act.... In all such suits, proceeding shall be had, Appeals taken, and judgments rendered in the same manner and with the same effect as if this Act had not been enacted." Pub.L. No. 104–88, § 204(c)(1) (emphasis added). While

therefore the Carmack Amendment is not applicable.

## V. *KAMINO'S LIMITATION OF LIABILITY IS ENFORCEABLE DUE TO ITS PRIOR COURSE OF DEALINGS WITH FOUNTAIN*

The federal common law allows carriers to limit their liability.[5]

As a general rule, under the federal common law governing common carriers, carriers may partially limit their liability for injury, loss, or destruction of baggage on a "released valuation" basis.... Under this doctrine, in exchange for a low carriage rate, the passenger-shipper is deemed to have released the carrier from liability beyond a stated amount.

*Deiro v. American Airlines, Inc.*, 816 F.2d 1360, 1365 (9th Cir.1987); *see also, e.g., Feature Enters., Inc. v. Continental Airlines*, 745 F.Supp. 198, 200 (S.D.N.Y.1990). However, a liability limitation provision is enforceable only if:

(1) it resulted from a fair, open, just, and reasonable agreement between carrier and shipper, entered into by the shipper for the purposes of obtaining the lower of two or more shipping rates proportioned to the amount of risk, and (2) the shipper was given the option of additional recovery upon paying a greater rate.... In determining whether these requirements for enforceability have been met, courts have

the instant cause of action arose when the computers were lost on February 25, 1995, this suit was not *commenced* until March 1996. Since the Court holds that the instant case is outside the jurisdiction of the ICC, making the Carmack Amendment inapplicable, the Court need not address the issue of whether the Carmack Amendment applies to suits commenced after January 1, 1996 upon causes of action that arose prior to that date.

5. Both parties rely on the federal common law regarding common carrier liability in framing their arguments concerning the enforceability of Kamino's asserted limitation of liability. (*See* Plf. Br. at 8–13 (relying on cases applying federal common law standards); Plf. Supp. Br. at 2; Kamino Supp. Br. at 7 ("Federal common law applies regarding liability where there are no controlling statutes or regulations").) Accordingly, the Court will apply the federal common law without further discussion.

considered such factors as (1) whether the carrier has given adequate notice of the limitation of its liability to the shipper, (2) the economic stature and commercial sophistication of the parties, (3) the availability of "spot" insurance to cover a shipper's exposure.

*Williams Dental Co. v. Air Express Int'l,* 824 F.Supp. 435, 441 (S.D.N.Y.), *aff'd mem.,* 17 F.3d 392 (2d Cir.1993); *see also, e.g.,* Owens–Corning Fiberglas Corp. v. U.S. Air, 853 F.Supp. 656, 665 (E.D.N.Y.1994); Feature Enters. v. Continental Airlines, 745 F.Supp. at 200; Welliver v. Federal Express Corp., 737 F.Supp. 205, 207 *(S.D.N.Y.1990); United States Gold Corp. v. Federal Express Corp.,* 719 F.Supp. 1217, 1224–25 (S.D.N.Y.1989).

As to the second and third factors, both parties are sophisticated business enterprises and it is clear that Fountain had the opportunity to obtain outside insurance coverage since it is Highmead's insurer that has brought this suit. As to the first factor, Fountain does not deny that Kamino's standard air waybill invites Kamino's customer, in return for a higher shipping rate, to declare a higher value for the goods being shipped than that assigned the goods in the absence of such a declaration. (*See* Plf. Reply Br. at 2, 4; Plf. Ex. H: Standard Air waybill.) Rather, Fountain puts forth two arguments supporting the proposition that it did not have notice of these limitations.

First, Fountain argues that no document containing any liability limitation was ever issued to it with respect to this shipment. (Plf. Br. at 9; Campise 3/21/97 Aff. ¶ 8.) However, the extensive course of dealings between Fountain and Kamino demonstrates that Fountain was familiar with Kamino's standard invoice and air waybill and Kamino's procedure of issuing the air waybill and invoice after the goods arrived at the airport. In light of this substantial course of dealing, Fountain was certainly on notice that liability limitations found in prior invoices and air waybills were incorporated into the parties' agreement to ship these computers. *See, e.g., Capitol Converting Equip., Inc. v. LEP Transport, Inc.,* 965 F.2d 391, 395–96 (7th Cir.1992) (where oral agreement did not include discussion of liability limitations and no

document was issued prior to shipment, Court held that "the parties' prior course of dealing [consisting of transactions involving issuance of invoices containing liability limitations] is fairly to be regarded as establishing [defendant's] liability limitation as part of their bargain."); *Calvin Klein Ltd. v. Trylon Trucking Corp.,* 892 F.2d 191, 193 (2d Cir. 1989) (where three year course of dealing involved issuance of invoice after completion of carriage, plaintiff admitted knowledge of limitation in invoice, and plaintiff did not declare higher value, liability limitation was enforceable); *Boeing Co.* v. *U.S.A.C. Transport, Inc.,* 539 F.2d 1228, 1230 (9th Cir.1976) ("On these facts the district court correctly granted summary judgment for the carrier [on the question of liability limitation]. The record manifests that [the parties] were engaged in an agreed-upon practice by which [the carrier] would transport [goods] ... solely at the 'released value' rate; that the carrier would issue its bill of lading embodying the contract of carriage some time after it had accepted the relevant shipment.... "); *Independent Mach., Inc. v. Kuehne & Nagel, Inc.,* 867 F.Supp. 752, 764 (N.D.Ill.1994) (invoice with liability limitation received following shipment; "[T]he time for determining the terms of a contract is generally 'when the bargain is struck'... It follows that a limitation of liability will not be binding unless it has been disclosed earlier.... Because the parties' contract here was formed when [plaintiff] accepted [defendant's] quote, any later attempt by [defendant] to limit its liability by sending an invoice laden with terms and conditions not discussed by the parties would fail if the agreement were an isolated and unique transaction ... However, the shipment was not an isolated transaction, but rather the most recent of a series of deals in which the same terms had appeared on prior invoices.").

Fountain also argues that it did not have notice of the liability limitations because Kamino has never "effectively state [d] one single limitation of liability," instead asserting two conflicting limitations—one on their air waybill, and another on their invoice. (*See* Plf. Br. at 8; Campise 3/21/97 Aff. ¶¶ 9– 10.) This argument too fails, however, be-

cause there is no conflict between the two provisions. The air waybill provides, in pertinent part:

> Except as otherwise provided in carrier's tariffs or conditions of carriage, in carriage to which the Warsaw Convention does not apply carriers' liability shall not exceed USD 20.00 or the equivalent per kilogram of goods lost, damaged or delayed, unless a higher value is declared by the shipper and a supplementary charge paid.

(Kamino Supp. Br. Ex. 2: Kamino Standard Air Waybill ¶ 4, emphasis added.) Thus, the air waybill extends the limitation applicable under the Warsaw Convention to non-Warsaw Convention settings. *See* The Warsaw Convention, Article 22(2) (providing for $20 per kilogram liability limitation). However, the air waybill provision also clearly states that it may be displaced by other conditions of carriage. (Kamino Supp. Br. Ex. 2: Kamino Standard Air Waybill ¶ 4 ("Except as otherwise provided in carrier's tariffs or conditions of carriage")). The $50 per package limitation in Kamino's invoice thus displaces the liability limitation contained in the waybill. Thus, the liability limitation of $50 per package contained in the invoice is applicable.[6] However, Kamino has stipulated that Fountain can apply the airbill's $20 per kilogram limitation if Fountain wishes. (Kamino Br. at 14.) Thus, Fountain now can choose the $50 per package or $20 per kilogram limitation.

In summary, the Court concludes that Fountain "was on notice as to the nature of the contract entered into and the limitations contained therein. [Fountain] could have declared a higher value and paid the premium for that protection—they certainly were on notice of the liability limitations and had ample opportunity to insure at a higher value, but failed to do so. [In fact, Highmead obtained independent insurance for the shipment.] Furthermore, [Fountain did not] lack bargaining power or somehow operate at the

mercy of [Kamino]. Public policy considerations of fair dealing and predictability in commerce thus favor enforcing this contract between two sophisticated corporate entities." *Hitachi Data Sys. Corp. v. Nippon Cargo Airlines Co.*, No. C–93–2456, 1995 WL 16923 at *4 (N.D.Cal. Jan. 6, 1995).

## CONCLUSION

For the reasons set forth above, Highmead's motion is denied and Kamino's partial summary judgment motion limiting its liability is granted.

## CONFERENCE

The parties are to call the Court's courtroom deputy (at 212–805–0039) within a week of receiving this Report and Recommendation to set up a conference to discuss the next steps to occur in the case, including settlement.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from receipt of this Report to file written objections. *See* also Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Allen G. Schwartz, 500 Pearl Street, Room 1350 and to the chambers of the undersigned, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Schwartz. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied*, 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993); Frank v. Johnson,

---

**6.** Kamino's affirmative defense refers to a $50 per shipment limitation. Kamino's counsel's sloppiness in drafting the answer has created additional confusion. (*See* Plf. Br. at 2–3.) The Court nevertheless grants Kamino's application to amend its defense pursuant to Fed.R.Civ.P. 15(a) and 15(b), the latter to conform to the evidence presented on this summary judgment motion. Leave to amend shall be freely granted, and plaintiff is not prejudiced by the late correction of this affirmative defense.

968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health & Human* Servs., 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).